IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Lester Sensing, )<br>)<br>Plaintiff, )<br>)<br>vs. )<br>)<br>Michael J. Astrue, )<br>Commissioner of Social Security, )<br>)<br>Defendant. )<br>_____ ) | Civil Action No. 6:10-3084-RBH-KFM<br><br>**REPORT OF MAGISTRATE JUDGE** |

This case is before the court for a report and recommendation pursuant to Local Civil Rule 73.02(B)(2)(a) DSC, concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

The plaintiff brought this action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act, as amended (42 U.S.C. 405(g) and 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying his claims for disability insurance benefits and supplemental security income benefits under Titles II and XVI of the Social Security Act.

## ADMINISTRATIVE PROCEEDINGS

The plaintiff filed applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") benefits on January 10, 2006, alleging that he became unable to work on August 10, 2005. The applications were denied initially and on reconsideration by the Social Security Administration. On September 19, 2006, the plaintiff requested a hearing. The administrative law judge ("ALJ"), before whom the plaintiff and Carroll H. Crawford, an impartial vocational expert, appeared on January 28, 2009,

---

[1]A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

considered the case *de novo*, and on March 18, 2009, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended.  The ALJ's finding became the final decision of the Commissioner of Social Security when it was approved by the Appeals Council on July 15, 2011.  The plaintiff then filed this action for judicial review.

In making his determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the ALJ:

1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2010.

2.  The claimant has not engaged in substantial gainful activity since August 10, 2005, the alleged onset date (20 C.F.R. §§ 404.1571 *et seq.*, and 416.971 *et seq.*)

3.  The claimant has the following severe impairments:  chronic obstructive pulmonary disease (COPD), cardiovascular disease, depression, anxiety disorder and a history of alcohol dependence (20 C.F.R. §§ 404.1521 *et seq.* and 416.921 *et seq.*).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1525, 404.1526, 416.926).

5.  After careful consideration of the entire record, I find  that the claimant has the RFC to stand/walk for 6 hours and sit for 6 of 8 hours in a workday, to lift a maximum of 10 pounds frequently and a maximum of 20 pounds occasionally; can frequently climb ramps/stairs, but can never climb ladders/ropes/scaffolds; can frequently balance, stoop, kneel, crouch, and crawl; needs to avoid concentrated exposure to fumes, dust and gases and to hazards such as machinery and heights; is limited to simple one and two-step tasks; and can never have contact with the public.

2

6. The claimant is unable to perform any past relevant work (20 C.F.R. §§ 404.1565 and 416.965).

7. The claimant was born on May 4, 1961 and was 44 years old, which is defined as a younger individual age 18-49, on the alleged onset date (20 C.F.R. §§ 404.1563 and 416.963).

8. The claimant has a limited education and is able to communicate in English (20 C.F.R. §§ 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 C.F.R. Part 404. Subpart B, Appendix 2).

10. Considering the claimant's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. §§ 404.1569, 404.1569(a), 416.969 and 416.969(a)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. §423(a). "Disability" is defined in 42 U.S.C. § 423(d)(1)(A) as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions. An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment that prevents past relevant work, and (5) has an impairment that prevents him from doing substantial gainful employment. 20 C.F.R. § 404.1520. If an individual is found not disabled at any step, further inquiry is unnecessary. *Id.* § 404.1520(a)(4).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62, 1982 WL 31386, at *3. The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5). He must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial

4

evidence and whether the correct law was applied. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. *See Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citation omitted).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings and that his conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## EVIDENCE PRESENTED

The plaintiff first presented as a new patient to Suzanne D. Kovacs, M.D., at Piedmont Internal Medicine, in September 2002. The plaintiff complained of anxiety, and Dr. Kovacs provided prescription refills for Paxil and Valium. The following month, he complained of decreased concentration, sleeping problems, and feeling nervous. Dr. Kovacs provided medication (Tr. 300-303). In February 2003, Dr. Kovacs noted that the plaintiff was "doing very well" with medication (Tr. Tr. 295-96). When he returned in September, the plaintiff complained of depression related to the death of a friend and stated his nerves were "just shot." He also continued to have back pain and fatigue. Dr. Kovacs increased his dosage of Lexapro and continued his other medications, including his anti-

5

inflammatory medication for back pain, and orderd testing for diabetes (Tr. 292-93).   In March 2004, Dr. Kovacs indicated the plaintiff's prescribed medications for anxiety and depression were "working well," and in November, she noted medication continued to help his condition.   Dr. Kovacs also noted that the plaintiff had pain on palpation of his right epicondyl.   She injected it with with Kenalog and lidocaine (Tr. 289-90, 286-87).   In March 2005, x-rays of the plaintiff's chest were normal, with the exception of granulomatous calcifications in his left lung.   He complained of stress and anxiety, and Dr. Kovacs changed his medication (Tr. 281-83).

On July 10, 2005, the plaintiff was treated in the emergency room of Mary Black Memorial Hospital and diagnosed with heat exhaustion.   He complained of feeling weak for several days and had a depressed affect (Tr. 252-60).   On July 21, 2005, Dr. Kovacs treated the plaintiff in follow-up to his emergency room visit.   The plaintiff felt he was not properly worked up in the emergency room because he continued to have severe daily headaches and blurry vision.   He also complained of impaired memory and fatigue.   Dr. Kovacs ordered various tests, including blood work and a brain CT scan.   Dr. Kovacs noted that the plaintiff's depression and anxiety had "done well" with medication (Tr. 276-77).

On July 28, 2005, the plaintiff underwent a carotid Doppler study that revealed "mild" carotid artery stenoses (Tr. 270-71).   On July 29, 2005, Dr. Kovacs reviewed various test results, noting that the CT scan of the brain, thyroid function tests, blood counts, and electrolytes were all normal.   She suggested that the plaintiff's headaches might be caused by blurry vision, so the plaintiff agreed to see an ophthalmologist.   She advised the plaintiff to stop smoking (Tr. 274-75).

The plaintiff presented to the emergency room at Gateway Medical Center on August 13, 2005, after overdosing on tranquilizers.   He received conservative treatment and was discharged that same day for further treatment at a mental health center (Tr. 348-79).

The plaintiff was admitted to Middle Tennessee Mental Health on August 15, 2005, following the drug overdose (*see* Tr. 348-379) and was diagnosed with a major depressive disorder (without psychotic features) and an anxiety disorder. He indicated he was stressed due to financial concerns, lack of employment, a recent move, and the fact he was the primary care provider for his ill mother. He was treated with medication and discharged the following day (Tr. 305-322). Upon discharge, on August 16th, his Global Assessment of Functioning ("GAF") was assessed as 51-60 (Tr. 307), which indicated his symptoms or difficulties were of only moderate severity.[2] Corey Campbell, D.O., noted that he anticipated the plaintiff would have noncompliance problems with medication and follow-up treatment (Tr. 307, 309).

On August 24, 2005, the plaintiff had a clinical intake assessment at Centerstone Mental Health Center. He presented for follow-up after his recent suicide attempt. Sensing reported eating less and having problems sleeping. He had been dealing with family losses over the last year and had been dealing with a stressful job. He felt he was "put down" at his job and "never got no credit for nothing." He was diagnosed with major depressive disorder, recurrent, severe, and anxiety disorder. It was noted that his current and highest GAF score was 44, with the lowest GAF score being 19. Functional assessment showed marked impairments including difficulty with distraction, mind wandering, and thoughts racing. In his assessment, the plaintiff was classified as having severe and persistent mental illness. He was referred for intensive outpatient therapy and received medication monitoring (Tr. 415-40).

On September 10, 2005, after presenting to the Gateway Medical Center with complaints of chest pain, x-rays of the plaintiff's chest were "unremarkable," showing no active disease or defect (Tr. 330, 332-33, 344). He was again treated in the emergency

---

[2] *See* Diagnostic of Statistical Manual of Mental Disorders - Text Revision (*DSM-TR*) 34 (4th ed. 2005)

room on October 7, 2005, for chest pain. He had an inconclusive treadmill stress test secondary to inability to achieve target heart rate. Underlying coronary artery disease could not be completely ruled out. The plaintiff's left ventricular systolic function showed an ejection fraction of 65%. He was discharged with instructions to seek follow-up (Tr. 394-411). He returned to the emergency room on October 21, 2005, presenting with sharp chest pain and shortness of breath. He was discharged with the diagnosis of atypical chest pain (Tr. 384-93).

After failing to show for numerous appointments (Tr. 453, 454, 455, 456, 457), the plaintiff presented to Centerstone Mental Health Center on October 21, 2005. He admitted that he had been out of his prescribed medication for "over a month" and declined any therapy or group to address his anxiety issues. When he returned the following month, the plaintiff admitted that medication had helped him sleep, and he again declined any treatment for anxiety (Tr. 443, 447, 448-52).

The plaintiff received treatment through St. Luke's Free Clinic from February 2006 to August 2010 (Tr. 492-518, 540-45, 563-76, 617-21, 637-48, 687-91, 813-30, 842-43, 845-49, 853-55, 862-64). Doctors at the clinic followed his multiple medical conditions and monitored his medications. On February 15, 2006, Dr. Watts stated the plaintiff had "frequent chest pain with substernal discomfort with left arm and shoulder radiation associated with dyspnea, diaphoresis, nausea, and perhaps syncope. It is relieved immediately by nitroglycerin and is provoked by almost any effort such as walking fast or walking up the stairs. He does continue to smoke cigarettes." Dr. Watt's impressions were that he had chest pain, possibly angina pectoris; chronic obstructive film related to cigarettes; and a history of incapacitating anxiety and depression including a history of a suicide attempt through deliberate overdose of his prescribed medications (Tr. 501-502).

James Ruffing, Psy. D., performed a consultative psychological evaluation of the plaintiff in March 2006. Dr. Ruffing indicated the plaintiff had a depressive disorder and

an anxiety disorder. He concluded that the plaintiff would have difficulty focusing, attending to tasks, and with persistence, concentration, and pace, but he could perform simple tasks (Tr. 466-68).

On April 10, 2006, Carol Kooistra, M.D., of Carolina Neurology, evaluated the plaintiff for headaches, which were occurring every two to three days without obvious trigger. They involved the left side of his head and involved throbbing pain associated with nausea, photophobia and blurred vision. The plaintiff was taking aspirin, Goody Powders, and Tylenol. Physical examination was essentially normal except for impairment in the heel to shin coordination test, right greater than left, and mild difficulty with tandem walking. Dr. Kooistra's impressions were probable migraine headaches and subcortical exam findings (Tr. 509-10).

In May 2006, Renukah Harper, Ph.D., a State agency medical consultant, completed a "Psychiatric Review Technique" form (Tr. 519-32). Based on a review of the evidence of record, Dr. Harper concluded that the plaintiff's mental impairments did not meet or equal a listed impairment and that he was only moderately limited in mental functioning (Tr. 529). Dr. Harper also completed a "Mental Residual Functional Capacity Assessment" form, in which she opined the plaintiff was not significantly limited in most areas of mental functioning and only moderately limited in his ability to understand and carry out detailed instructions, interact appropriately with the public, and set realistic goals (Tr. 533-34).

In June 2006, the plaintiff was transported to the emergency room after reporting that he could not cope with day to day activities. He stated that he had refused to take his medications for about the last week and admitted to drinking alcohol that day and daily. The clinical impression was depression and anxiety (Tr. 661-72).

The plaintiff sought intermittent treatment for alcohol dependence, anxiety, and a personality disorder at Spartanburg Mental Health from July 2006 through August

9

2010 (Tr. 584-615, 625-35, 649-52, 692-95, 805-12, 841-43, 850-59).[3]  When initially evaluated, Aki Shigemi, M.Div., Ed.S.,[4] assessed the plaintiff's GAF as 55 (Tr. 601), which indicated his symptoms or difficulties were of only moderate severity.[5]  In December 2006, Mr. Shigemi completed a "Mental Residual Functional Capacity Assessment" form at the request of the plaintiff's attorney, in which he opined the plaintiff suffered from marked limitations in almost all areas of mental functioning (Tr. 559-61).  That same month, however, E. Freeman Smith, M.D., noted that the plaintiff was doing better, and his hallucinations had "improved significantly although he still experiences them occasionally." The plaintiff stated that the occasional auditory hallucinations were "not really a problem currently" (Tr. 590).

In March 2007, the plaintiff reported that he was taking his medication as prescribed and was "doing well."  The following month, the plaintiff reported auditory hallucinations that "argued" with him, and Dr. Smith changed his medication (Tr. 589, 591). In January 2008, Laurel A. Weston, M.D., noted that the plaintiff's auditory hallucinations were "definitely improving" with medication, and she opined that his depression was situational in that it was related to financial problems.  In April and July, Dr. Smith indicated that the plaintiff "continues to do well," and the plaintiff reported "improvement in symptoms and control of anxiety and stress" (Tr. 629, 634, 651, 652).  In February 2009, the plaintiff informed Dr. Smith that he was "doing well," although he complained of some problems sleeping (Tr. 811).  In October 2009, the plaintiff indicated that he was "doing well" and was "functioning satisfactorily" (Tr. 809).  The plaintiff indicated in March 2010 that he had been doing fairly well until the preceding month, when he had difficulty sleeping, and with

---

[3] The plaintiff frequently missed scheduled appointments (*see, e.g.,* Tr. 585, 587, 596, 608, 611, 612, 628, 635).

[4] M.Div. is a Master of Divinity; Ed.S. is an Education Specialist.

[5] *See DSM-TR* at 34.

depression and anxiety. Dr. Smith adjusted his medication (Tr. 843). In June, the plaintiff reported he was sleeping better (Tr. 858).

Dr. Ruffing performed a second evaluation in July 2007 at the request of the plaintiff's attorney (Tr. 576-81). Examination showed the plaintiff's speech was spontaneous, responsive, and articulate; mood was anxious; orientation was normal; thoughts were intact, relevant, coherent, and goal-directed; concentration was impaired; memory was intact; and the plaintiff read at the equivalency of the fourth grade (Tr. 580).

On July 15, 2008, the plaintiff underwent a stress test and myocardial perfusion imaging. The SPECT perfusion images demonstrate a small fixed apical perfusion defect without significant reversibility. There was no evidence for inducible ischemia (Tr. 657-60).

On January 6, 2009, the plaintiff presented to the emergency room with weakness, facial droop, and impaired speech. Clinical findings were consistent with right capsular stroke and possible middle cerebral embolic infarction. His symptoms improved somewhat following treatment with tissue plasminogen activator ("TPA"). There was a notation that a MRI of the brain showed no definite evidence of stroke other than subcortical white matter changes. The plaintiff was discharged on January 10, 2009. His discharge diagnosis was stroke. A prescription for Plavix was added to his medications (Tr. 728-72).

On January 19, 2009, the plaintiff had a therapy evaluation for left upper and lower extremity weakness and decreased coordination, and decreased balance and difficulty walking. He was scheduled for treatment two times per week for a four week period, which included occupational therapy, therapeutic exercises, home exercise program, neuromuscular reeducation, and gait training. The plaintiff was discharged from therapy on February 12, 2009, after reaching goals and expected outcomes (Tr. 775-804).

Dr. Ruffing performed a third evaluation in January 2009, again at the request of the plaintiff's attorney. The Minnesota Multiphasic Personality Inventory-2 ("MMPI-2")

was administered, which indicated the plaintiff over-reported his symptoms and difficulties. Dr. Ruffing concluded that the plaintiff would have difficulty in attending, focusing, and concentrating on an extended basis, and would struggle to maintain concentration, persistence, and pace in a work environment. Dr. Ruffing noted that over-reporting of symptoms does not necessarily indicate the absence of psychological symptomatology, but it was his opinion that the plaintiff over-reported symptoms due to the nature and potential implications of the examination, more specifically approval for disability. Dr. Ruffing stated that there were indications for the diagnosis of major depressive disorder, recurrent severe with psychotic features with a potentially diminishing severity and involvement of psychotic features, and anxiety disorder (Tr. 710-15).

The plaintiff testified at the administrative hearing that he was 47 years old at the time of his hearing, completed 11th grade in school, and had difficulty reading and writing. He said he had last worked as a detailer at a car dealership and that he had stopped working due to depression and "nerves" (Tr. 36-37, 39). He said he had also suffered a "heart attack or two," and said he would get short of breath if he had to walk "a whole lot" at a fast pace (Tr. 57).

The ALJ posed a hypothetical question to the vocational expert based on a person of the plaintiff's age, education, and vocational experience who could stand/walk for six hours and sit for six hours in an eight-hour workday; lift 10 pounds frequently and 20 pounds occasionally; frequently climb ramps and stairs; never climb ladders, ropes, or scaffolds; frequently balance, stoop, kneel, crouch, or crawl; needed to avoid concentrated exposure to fumes, dust, and gases; could have no contact with the public; and was limited to simple one- and two-step tasks (Supp. Tr. 942; *see also* Tr. 29).[6] In response, Mr.

---

[6]   The first part of the hypothetical question is not included in the transcription of the administrative hearing (*see* Supp. Tr. 941-42). However, as stated by the ALJ, the question was based on the residual functional capacity assessment ultimately accepted by the ALJ (Tr. 29). The Commissioner provided a supplemental administrative record (doc. 17), which also did not include

Crawford testified that such a person could not perform the plaintiff's past relevant work as a detailer, janitor, mechanic, or gate guard. However, he said that such a person could perform other unskilled jobs of light exertion, such as small parts assembler, electrical assembler, or nut and bolt assembler (Supp. Tr. 942).

## **ANALYSIS**

The plaintiff alleges disability commencing August 10, 2005, at which time he was 44 years old. He has a limited education and past relevant work as a detailer, janitor, mechanic, and gate guard. The ALJ found that the plaintiff's chronic obstructive pulmonary disease ("COPD"), cardiovascular disease, depression, anxiety disorder, and history of alcohol dependence were severe impairments. The ALJ further determined that the plaintiff could perform a reduced range of unskilled light work and that work existed in significant numbers in the national economy that he could perform. The plaintiff argues that the ALJ erred by (1) failing to properly consider the opinions of Mr. Shigemi and examining physician Dr. Ruffing; (2) failing to properly assess his credibility; (3) presenting an improper hypothetical to the vocational expert; and (4) filing an incomplete administrative record.

### *Opinion Evidence*

The regulations require that all medical opinions in a case be considered, 20 C.F.R. § 416.927(b), and, unless a treating source's opinion is given controlling weight, weighed according to the following non-exclusive list: (1) the length of the treatment relationship and the frequency of the examinations; (2) the nature and extent of the treatment relationship; (3) the evidence with which the physician supports his opinion; (4) the consistency of the opinion; and (5) whether the physician is a specialist in the area in

---

the missing pages. Also, the page numbers for approximately half of the supplemental administrative record are unreadable; the court has endeavored to provide correct references to page numbers in the supplemental administrative record to the extent possible.

which he is rendering an opinion. 20 C.F.R. § 416.927(d)(2)-(5). *See also Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005). However, statements that a patient is "disabled," "unable to work," meets the listing requirements, or similar assertions are not medical opinions. These are administrative findings reserved for the Commissioner's determination. SSR 96-5p, 1996 WL 374183, at *5.

Mr. Shigemi, who has degrees in theology and education but is not a "treating psychiatrist" as identified by the plaintiff (*compare* pl. brief at 16 *with* Tr. 601), examined the plaintiff at Spartanburg Area Mental Health. He performed an initial psychiatric assessment on July 16, 2006. Mr. Shigemi's mental status examination revealed the following: affect was not appropriate to thought content; mood was depressed and aggressive with anger; feelings of unreality; immediate, recent, and remote memories were all poor; judgment was poor; sensorium was clouded; intellectual functioning was below average; unable to concentrate; thought process showed flight of ideas; and thought content was angry. His GAF score was 55 (Tr. 600-601).

On December 28, 2006, Mr. Shigemi completed a Mental Residual Functional Capacity Evaluation. Mr. Shigemi rated the plaintiff's limitations in the following abilities as "marked":

> to remember locations and work-like procedures; to understand and remember very short and simple instructions; to understand and remember detailed instructions; to carry out very short and simple instructions, to carry out detailed instructions; to maintain attention and concentration for extended periods; to work in coordination with or proximity to others without being distracted by them; to make simple work-related decisions; to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at consistent pace without an unreasonable number and length of rest periods; to interact appropriately with the general public; to ask simple questions or request assistance; to accept instructions and respond appropriately to criticism from supervisors; to be aware of normal hazards and take appropriate precautions; to travel in

unfamiliar places or use public transportation; and, to set realistic goals or make plans independently of others.

(Tr. 559-60). Mr. Shigemi also noted that the plaintiff complained of memory problems and easily forgetting significant appointments and tasks (Tr. 561).

The ALJ assigned Mr. Shigemi's opinion little weight, stating:

I have considered Mr. Shigemi's statement of December 2006. However, some of his responses are ambiguous and his conclusions are contradictory. At the time of his report, claimant had been a patient at Spartanburg Area Mental Health Center for only five months. The only evidence he could cite to support his conclusions was that claimant had alleged having memory problems. For these reasons, I assign little weight to his conclusions.

(Tr. 28).

Mr. Shigemi is not an "acceptable medical source" as defined in the regulations. *See* 20 C.F.R. § 404.1513(a). However, the ALJ may consider the opinion along with the other evidence of record. *See id.* § 404.1513(d)(1) ("In addition to evidence from the acceptable medical sources . . . we may also use evidence from other sources to show the severity of your impairment(s) and how it affects your ability to work. Other sources include, but are not limited to - (1) Medical sources not listed in paragraph (a) of this section (for example, . . . therapists . . . ."). As pointed out by the ALJ, the plaintiff had only been treated at Spartanburg Mental Health for five months at the time Mr. Shigemi gave his opinion. Importantly, there is no evidence of record that Mr. Shigemi provided any treatment to the plaintiff during that time. The record shows that the plaintiff's treating physicians at Spartanburg Mental Health were Drs. Smith and Weston, both of whom consistently noted the plaintiff was doing well with medication (Tr. 589-90, 629, 634, 651, 809, 811). The plaintiff's GAF at intake at Spartanburg Mental Health was 55 (Tr. 601), which indicated that his symptoms were of moderate severity. There is no indication in the record that his condition deteriorated between that assessment in July 2006 and December

2006, when Mr. Shigemi opined that the plaintiff suffered from marked limitations in most areas of functioning. Here, the ALJ properly considered the opinion of Mr. Shigemi, and the determination is supported by substantial evidence of record. Accordingly, this court finds no merit to this assignment of error.

The plaintiff next argues that the ALJ failed to give proper consideration to the opinion of Dr. Ruffing, who examined the plaintiff on three occasions. Dr. Ruffing performed a consultative psychological evaluation of the plaintiff in March 2006. Dr. Ruffing indicated the plaintiff had a depressive disorder and an anxiety disorder. He concluded that the plaintiff would have difficulty focusing, attending to tasks, and with persistence, concentration, and pace, but he could perform simple tasks (Tr. 466-68). Dr. Ruffing performed a second evaluation in July 2007 at the request of the plaintiff's attorney (Tr. 576-81). Examination showed the plaintiff's speech was spontaneous, responsive, and articulate; mood was anxious; orientation was normal; thoughts were intact, relevant, coherent, and goal-directed; concentration was impaired; memory was intact; and the plaintiff read at the equivalency of the fourth grade (Tr. 580). Dr. Ruffing performed a third evaluation in January 2009, again at the request of the plaintiff's attorney. The MMPI-2 was administered, which indicated the plaintiff over-reported his symptoms and difficulties. Dr. Ruffing concluded that the plaintiff would have difficulty in attending, focusing, and concentrating on an extended basis, and would struggle to maintain concentration, persistence, and pace in a work environment. Dr. Ruffing noted that over-reporting of symptoms does not necessarily indicate the absence of psychological symptomatology, but it was his opinion that the plaintiff over-reported symptoms due to the nature and potential implications of the examination, more specifically approval for disability. Dr. Ruffing stated that there were indications for the diagnosis of major depressive disorder, recurrent severe with psychotic features with a potentially diminishing severity and involvement of psychotic features, and anxiety disorder (Tr. 710-15).

16

The ALJ gave little weight to Dr. Ruffing's "most recent statements indicating significant limitations in claimant's ability to work," stating as follows, "Dr. Ruffing did not account for the inconsistencies he referred to in his own report, including an invalid MMPI profile indicating over-reporting or exaggeration of symptoms and indications that claimant was responding to treatment with medications" (Tr. 28).

The ALJ's assessment of Dr. Ruffing's opinion is based upon substantial evidence of record. Although Dr. Ruffing opined that the plaintiff suffered from significant mental limitations (Tr. 714), the ALJ reasonably noted that the MMPI-2 administered by Dr. Ruffing indicated that the plaintiff over-reported his symptoms and difficulties (Tr. 28; *see* Tr. 714). *See Stacy v. Chater*, No. 94-2535, 1995 WL 691954, at *3 (4th Cir. 1995) (noting the ALJ reasonably concluded, "just as any reasonable unbiased factfinder" would, that the MMPI-2 scores indicated that there was a possibility claimant was malingering or exaggerating his symptoms). Moreover, as noted by the ALJ, the record reflects that the plaintiff's condition improved with medication. For example, Dr. Smith, a treating physician at Spartanburg Mental Health, consistently noted that the plaintiff was "doing better" with medication (Tr. 589, 590, 629, 634, 651, 809, 811). *See Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986) ("If a symptom can be reasonably controlled by medication or treatment, it is not disabling."). Based upon the foregoing, the ALJ properly considered the opinion of examining physician Dr. Ruffing, and the determination is supported by substantial evidence of record. Accordingly, this court finds no merit to this assignment of error.

### *Credibility*

The plaintiff next argues that the ALJ failed to properly consider his credibility. The Fourth Circuit Court of Appeals has stated as follows with regard to the analysis of a claimant's subjective complaints:

> [T]he determination of whether a person is disabled by pain or other symptoms is a two-step process. First, there must be objective medical evidence showing the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged. . . . It is only after a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated.

*Craig v. Chater*, 76 F.3d 585, 593, 595 (4th Cir. 1996). A claimant's symptoms, including pain, are considered to diminish his capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical evidence and other evidence. 20 C.F.R. §§ 404.1529(c)(4) and 416.929(c)(4). Furthermore, "a formalistic factor-by-factor recitation of the evidence" is unnecessary as long as the ALJ "sets forth the specific evidence [he] relies on in evaluating the claimant's credibility." *White v. Massanari*, 271 F.3d 1256, 1261 (10th Cir. 2001). Social Security Ruling 96-7p states that the ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record." 1996 WL 374186, at *4. Furthermore, it "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and reasons for that weight." *Id.*

The factors to be considered by an ALJ when assessing the credibility of an individual's statements include the following:

(1)    the individual's daily activities;

(2)    the location, duration, frequency, and intensity of the individual's pain or other symptoms;

(3)    factors that precipitate and aggravate the symptoms;

(4)    the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

18

(5)     treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

(6)     any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

(7)     any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

*Id.* at *3.

The ALJ found that the plaintiff's subjective complaints were not fully credible (Tr. 28), noting that the plaintiff received only conservative treatment for his allegedly disabling impairments (Tr. 27-28); he had a record of noncompliance (Tr. 27; *see, e.g.*, Tr. 309, 448); he stopped working not due to his impairments, but rather to care for his elderly mother (Tr. 26; *see, e.g.*, Tr. 309, 312); he expressed an intention to return to work after his alleged onset date (Tr. 26; *see, e.g.*, Tr. 308, 312); he routinely declined to participate in recommended therapy and group sessions (Tr. 27; *see, e.g.,*Tr. 452, 447); he missed numerous appointments with his physicians (Tr. 27; *see, e.g.*, Tr. 453, 454, 455, 456, 457, 585, 587, 596, 608, 611, 612, 628, 635); he had not been forthcoming in reporting his history of substance abuse (Tr. 27); and an MMPI-2 test indicated that the plaintiff was over-reporting and exaggerating his symptoms and difficulties (Tr. 21; *see, e.g.,* Tr. 713-14). The above evidence was appropriate for consideration in weighing the plaintiff's subjective complaints. *See English v. Shalala*, 10 F.3d 1080,1084 (4th Cir. 1993) (citing with approval the fact that the plaintiff failed to take his medication as prescribed undermined claims of disability); *see also Mickles v. Shalala*, 29 F.3d 918, 921 (4th Cir. 1994) (failure to seek medical treatment may support a finding that a claimant's impairments are not of disabling severity).

The ALJ also noted that the plaintiff continued to smoke up to four packs of cigarettes per day despite repeated advice from his physicians to stop due to the fact that he suffered from COPD (Tr. 27). The plaintiff argues that "it was improper for the ALJ to use this information in determining [the plaintiff's] credibility" because of the addictive nature of smoking (pl. brief at 26). The plaintiff cites no controlling authority on this issue. The ALJ also noted that the evidence of record did not support the plaintiff's claims that he had experienced a "couple" of heart attacks and strokes (Tr. 20, 26). The plaintiff argues that "[i]t is clear that [the plaintiff] considers these episodes as 'heart attacks'" and cites evidence supporting that argument (pl. brief at 24-26).

Here, it is clear that the ALJ considered the record as a whole and gave valid reasons for finding that the plaintiff's allegations concerning the severity of his symptoms were not credible. Even assuming the failure to cease smoking and reports regarding heart attacks and strokes do not support an adverse credibility determination, the other evidence cited by the ALJ in support of the credibility determination are more than sufficient to sustain his finding. Accordingly, this allegation of error is without merit.

***Hypothetical***

The plaintiff next argues that the ALJ gave an improper hypothetical to the vocational expert. "[I]n order for a vocational expert's opinion to be relevant or helpful, it must be based upon a consideration of all other evidence in the record, and it must be in response to proper hypothetical questions which fairly set out all of claimant's impairments." *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989) (citation omitted).

The ALJ limited the plaintiff in the residual functional capacity finding and in the hypothetical to the vocational expert to "simple, one, two-step tasks" (Tr. 24; Supp. Tr. 942). In response to the hypothetical, the vocational expert testified that such a person could perform unskilled jobs of light exertion, such as small parts assembler, electrical assembler, or nut and bolt assembler (Supp. Tr. 942). The plaintiff argues that the ALJ

20

erred in failing to include his moderate limitation in concentration, persistence, or pace in the hypothetical to the vocational expert. The plaintiff acknowledges that the issue has not been addressed by the Fourth Circuit and cites other circuits in support of his argument (pl. brief at 29). This court finds the argument unpersuasive.

Unskilled work is by definition work that requires the ability to understand, carry out, and remember only simple instructions. *See* 20 C.F.R. § 404.1521. Similarly, SSR 96-9p, states that basic work-related mental activities required by competitive unskilled work requires only the ability to understand, remember, and carry out simple instructions. 1996 WL 374185, at *2. *See also* SSR 85-15, 1985 WL 56857, at *4. Because these regulations and rulings establish that unskilled work requires the ability to understand, carry out, and remember only simple instructions, the plaintiff's residual functional capacity reflects that he retained the mental abilities to perform the requirements of unskilled work.

Furthermore, as argued by the Commissioner, the plaintiff has made no showing that his moderate difficulties regarding concentration, persistence, or pace (Tr. 23) would result in an inability to perform the requirements of unskilled work or further degrade the occupational base. Dr. Harper, a State agency physician whose opinion was found by the ALJ to be well-supported by the evidence of record (Tr. 24), determined that the plaintiff would have moderate difficulties in maintaining concentration, persistence, or pace (Tr. 529). However, she further opined that the plaintiff's only functional limitation in that regard would be a moderate limitation in his ability to understand, remember, and carry out detailed instructions (Tr. 533). Indeed, Dr. Harper specifically found that the plaintiff could perform the requirements of unskilled work (Tr. 535). *See* SSR 96-6p, 1996 WL 374180, at *1 (findings of fact made by State agency medical and psychological consultants and other program physicians and psychologists regarding the nature and severity of an individuals impairments must be treated as expert opinion evidence of nonexamining sources). Based upon the foregoing, this allegation of error is without merit.

21

***Administrative Record***

Lastly, the plaintiff argues that the Commissioner has provided an inadequate record for review because the first part of the hypothetical question is not included in the transcription of the administrative hearing (*see* Supp. Tr. 941-42). The Commissioner provided a supplemental administrative record (doc. 17), which also did not include the missing pages. However, as stated by the ALJ, the question was based on the residual functional capacity assessment ultimately accepted by the ALJ (Tr. 29; *see also* Tr. 24).

While acknowledging the omission, the Commissioner argues that the plaintiff has failed to show he has been prejudiced in any way due to this error. This court agrees. The plaintiff does not contend that the hypothetical question posed to the vocational expert did not mirror the ALJ's residual functional capacity assessment, as the ALJ indicated (Tr. 29). Furthermore, it is noteworthy that the plaintiff was represented at the hearing by the same attorney currently representing him in the case now before this court (*see* Supp. Tr. 873). As such, the omission of a small part of the hypothetical question from the transcript represents, at most, harmless error and as such provides no basis for remand. *See Mickles*, 29 F.3d at 921 (finding the ALJ's error harmless where the ALJ would have reached the same result notwithstanding).

## CONCLUSION AND RECOMMENDATION

This court finds that the Commissioner's decision is based upon substantial evidence and free of legal error. Now, therefore, based upon the foregoing,

IT IS RECOMMENDED that the Commissioner's decision be affirmed.

IT IS SO RECOMMENDED.

s/ Kevin F. McDonald
United States Magistrate Judge

February 10, 2012
Greenville, South Carolina